UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNIVERSITY OF VERMONT STUDENTS FOR JUSTICE IN PALESTINE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:24-cv-978 |
| THE UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE; and LINA BALCOM, UVM Director of Student Life and JEROME BUDOMO, UVM Associate Director of Student Life, each in their Official Capacities, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff University of Vermont Students for Justice in Palestine ("UVMSJP") brings this action claiming Defendants University of Vermont and State Agricultural College ("UVM" or "University"), UVM Director of Student Life Lina Balcom, and UVM Associate Director of Student Life Jerome Budomo violated its constitutional rights after members of the group participated in an on-campus demonstration. Defendants contend that the temporary suspension of UVMSJP for allegedly violating University rules and policies, together with the ensuing administrative investigation process, did not violate the

group's rights.  Pending before the Court are UVMSJP's motion
for a preliminary injunction and Defendants' motion to dismiss.

For the reasons set forth below, the motion to dismiss (ECF
No. 9) is granted and the motion for a preliminary injunction
(ECF No. 2) is denied as moot.

### Factual Background

UVMSJP is a student organization founded in 2011 for the
purpose of advocating for justice for the Palestinian people.
UVM is a public university.  On April 28, 2024, UVMSJP began
participating in what would become a ten-day demonstration
opposing the war in Gaza.  The demonstration took place on UVM's
Andrew Harris Commons, also referred to as the Davis Center
Green.

The Verified Complaint alleges that the demonstration began
with approximately 50 students and about a dozen tents.  The
event reportedly included teach-ins, lectures, and group
discussions.  The Verified Complaint also alleges that
demonstrators had trained de-escalators available to calm
confrontations and prevent violence between demonstrators and
counter-demonstrators.  UVMSJP was not a formal sponsor of the
demonstration, but did collaborate with other participants and
encouraged participation.

At the time of the demonstration, UVMSJP was a Recognized
Student Organization.  Defendants submit, and Plaintiff does not

dispute, that Recognized Student Organizations are granted certain opportunities, including the ability to use the name of the University and other indicia of association, use of University buildings and grounds without a rental charge, and the opportunity to obtain voicemail and email accounts through the University.  UVM's Operating Procedure provides that officers, leaders, and members of a Recognized Student Organization are "expected to know and abide by all University policies," and may be held collectively responsible with the organization when violations occur.  ECF No. 1-3 at 2.  The University Operating Procedure also provides a "detailed process" for addressing such violations.  *Id.*

The alleged violations at issue here center on the use of the Davis Center Green.  According to the Complaint, the UVM Chief of Compliance and Safety informed demonstrators on April 28, 2024 – the first day of the demonstration – that tents being used were a violation of University guidelines.  On May 1, 2024, UVM Dean of Students David Nestor sent a letter ("Notice") to the UVMSJP President notifying the group that the University had "received information about alleged conduct by [UVMSJP] that, if true, would violate University policies."  ECF No. 1-2 at 2.  The letter informed the group that it was under investigation for:

- Using the Davis Center Green to the exclusion of

others for non-commercial solicitation without a
reservation;

- Disruption of scheduled tabling and other reservation
  of space outside the Davis Center;

- Disruption of normal student engagement and/or
  academic work patterns;

- Setting up tents ("temporary structure") on the Davis
  Center Green without a permit and declining to remove
  them when requested;

- Overnight occupancy of a temporary structure;

- Encouraging and facilitating the violation of policy
  by other students.

*Id.*[1]

The Notice cited various UVM policies, including the

Student Organization Misconduct Investigation and Resolution

policy; the Posting and Solicitation policy; the Temporary

Structures policy; the Facilities and Grounds Use for Events and

Activities policy; the "Free Expression; Campus Speakers;

Response to Disruption" policy; and the Code of Student Conduct.

*Id.* at 2-3.  The Notice also explained that the University was

taking action because of "concerning behavior and encouragement

---

[1]  The Verified Complaint includes several references to the
University's charges against an individual student.  ECF No. 1
at 10-11, 14, ¶¶ 52-55, 72.  The findings made with reference to
that student did not necessarily carry over to the actions of
other members of UVMSJP.  In fact, UVM specifically found that
the charged student was unable to control the actions of others.
*Id.* at 14, ¶ 72.  The Court therefore declines to infer that
those findings apply equally to the charges brought against
UVMSJP as a group.

of willful violation of university policies following repeated notice and requests to cease," which "had a direct impact on the safety of students and university operations." *Id.* at 4. The Notice stated that the University was "suspending all operations of [UVMSJP] on an interim basis, effective immediately," although members of the group could meet to address the forthcoming internal investigation. *Id.* That investigation was to be led by Defendant Jerome Budomo, UVM's Associate Director of Student Life.

The Verified Complaint alleges that the tents in question were voluntarily removed at the conclusion of the demonstration on May 7-8, 2024. During the summer of 2024, Defendant Lina Balcom, UVM Director of Student Life, sent emails to UVMSJP explaining that the investigation had not yet commenced. UVMSJP alleges that the delay was a pretext to continue the interim suspension.

On August 12, 2024, UVMSJP's attorney, together with the group's faculty advisor, Helen Scott, requested to meet with Director of Student Life Balcom for a re-evaluation of the interim suspension. On August 15, 2024, UVM's General Counsel allegedly communicated that UVMSJP's options were to either participate in the investigation process or to engage in an administrative conference. The Verified Complaint alleges that the administrative conference requires the student organization

to admit to the violation and accept responsibility in lieu of
proceeding to a formal investigation.  UVMSJP declined to make
any such admission, and thus declined to participate in an
administrative conference.  In a letter dated August 21, 2024,
UVMSJP's counsel allegedly informed the University that the
group also declined to participate in the investigation process.

UVMSJP commenced this litigation on September 9, 2024,
asserting six causes of action.  Count I alleges the Notice from
UVM was an unconstitutional prior restraint of UVMSJP's First
Amendment rights to speak, associate, peaceably assemble, and
use the same campus resources as other student organizations.
Count I also claims a lack of proper notice.  Count II alleges
that "defendants have no constitutionally permissible basis
either on an interim or permanent basis to sanction UVMSJP by
suspension of its First Amendment rights."  ECF No. 1 at 9, ¶
46.  Count III claims that UVM's policies are contradictory,
provide University officials with unbridled discretion, and were
waived because the University allowed the demonstration and did
not forcibly remove the tents.  Count IV alleges that putting up
tents constitutes symbolic speech, that no notice of trespass
was ever issued, and that UVM's temporary structure policy
violated UVMSJP's First Amendment speech and Fourteenth
Amendment due process rights.  Count V claims that UVM failed to
provide sufficient notice to students of the applicable

6

administrative rules, thereby again violating UVMSJP's due
process rights.  Count VI asserts that barring attorneys from
the investigative process violates UVMSJP's First Amendment
rights of freedom of association.  The University's
investigation process does not allow an attorney to be present
or to speak on the subject's behalf, although the Director of
Student Life may permit a lawyer to be present when related
criminal charges are filed and pending.

The Verified Complaint contends that because UVM's policies
were ambiguous and contradictory, allowed unbridled discretion,
and lacked narrow tailoring, students were entitled to
"disregard any prior permit requirements for the demonstrations
and rallies," ECF No. 1 at 12, ¶ 61, as well as permit
requirements pertaining to tents, *id.* at 14, ¶ 71.  Defendants
submit that these allegations implicitly concede Plaintiff's
violations of University policies.

Defendants now move to dismiss all claims, arguing that
there has been no prior restraint; that UVMSJP lacks standing to
bring Counts II-V because there has been no decision regarding
policy violations; that the University's policies are
constitutional; and that there has been no due process

7

violation.[2]  The motion is opposed.  Also pending before the
Court is UVMSJP's motion for a preliminary injunction.

## Discussion

### I.  Motion to Dismiss Standard

Defendants move to dismiss pursuant to Federal Rule of
Civil Procedure 12(b), arguing that UVMSJP has failed to state a
claim upon which relief can be granted and that the group lacks
standing because its claims are not ripe.  On a motion to
dismiss for failure to state a claim, filed under Rule 12(b)(6),
a court accepts as true the facts alleged in the complaint and
draws all reasonable inferences in the plaintiff's favor.  *Burch
v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir.
2008).  To survive dismissal, a complaint must allege sufficient
facts to state a plausible claim.  *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007).  A claim is plausible when the
plaintiff pleads facts to support the reasonable inference that
the defendant has acted unlawfully.  *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009).

Standing and ripeness are addressed under Federal Rule of
Civil Procedure 12(b)(1).  *See Sunrise Detox V, LLC v. City of*

---

[2]  Defendants' motion also argues for the application of
qualified immunity if UVMSJP is seeking damages.  UVMSJP's
opposition memorandum makes clear that it is not seeking
damages.  Consequently, the Court will not address the question
of qualified immunity.

*White Plains*, 769 F.3d 118, 121 (2d. Cir. 2014) (conducting a ripeness inquiry pursuant to Rule 12(b)(1)); *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("[T]he proper procedural route [for a standing challenge] is a motion under Rule 12(b)(1)."). The standards for dismissal under Rules 12(b)(1) and 12(b)(6) are, for the most part, substantively identical, *see Lerner v. Fleet Bank*, *N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), with the important exception that the party invoking the jurisdiction of the court bears the burden of proof in a Rule 12(b)(1) motion, while the defendant bears the burden of proof in a 12(b)(6) motion. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994).

Where, as here, a motion to dismiss requires a court to address arguments raised pursuant to both Rules 12(b)(1) and 12(b)(6), "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F. 2d 674, 678 (2d Cir. 1990) (quoting 5 C. Wright and A. Miller, Federal Practice and Procedure, § 1350, p. 548 (1969)).

## II. Standing

Defendants' standing argument is limited to Counts II through V. Count II asserts that Defendants cannot lawfully

sanction UVMSJP on either an interim or a permanent basis.
Count III, IV, and V similarly object to any form of sanction.
The motion to dismiss submits that UVMSJP has not been found
responsible for any policy violations, and that there has thus
been no actual injury.  Defendants also contend that, even if
the Court finds an actual case or controversy, it would not be
prudent to address the Complaint before the University's
administrative process has been completed.

Standing "is the threshold question in every federal case,
determining the power of the court to entertain the suit."
*Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To establish
standing, UVMSJP must satisfy three requirements.  First, it
"must have suffered an injury in fact — an invasion of a legally
protected interest which is (a) concrete and particularized and
(b) actual or imminent, not conjectural or hypothetical."  *Lujan
v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations
and internal quotation marks omitted).  Second, "there must be a
causal connection between the injury and the conduct complained
of — the injury has to be fairly traceable to the challenged
action of the defendant."  *Id.* (alterations adopted) (internal
quotation marks omitted).  Third, "it must be likely, as opposed
to merely speculative, that the injury will be redressed by a
favorable decision."  *Id.*

10

Here, the Court finds that UVMSJP has adequately
demonstrated standing.  While the motion to dismiss focuses on a
permanent sanction, the Verified Complaint alleges that the
interim suspension constitutes its own injury.  The Court agrees
with UVMSJP's assertion of injury, as the group has been
temporarily barred from acting as a Recognized Student
Organization except within the parameters set by the University.
The alleged restrictions on the group's activities are the
result of the interim suspension and are both concrete and
actual.  Furthermore, Defendants cite no binding authority for
the proposition that a student group must exhaust its
administrative remedies before seeking injunctive and/or
declaratory relief in federal court.  Dismissal for lack of
standing to bring Counts II-V is therefore not warranted.

## III. Prior Restraint Claim

The Verified Complaint alleges in Count I that Defendants'
actions constitute an unlawful "prior restraint" of UVMSJP's
First Amendment rights.  Defendants contend that the sole
restraint has been the interim suspension of a group that is
alleged to have violated neutral and reasonable University
policies.  Defendants also assert that non-recognition of a
student group does not prohibit its members from either speaking
or associating.  Finally, Defendants argue that the restraint

11

was based upon conduct, not the content of any speech or
message, and is therefore not actionable.

There are "two traditional types of prior restraint: (1)
preventing the printed publication of disfavored information,
and (2) a facially-neutral law that sets up an administrative
apparatus with the power and discretion to weed out disfavored
expression before it occurs." *Citizens United v. Schneiderman*,
882 F.3d 374, 386-87 (2d Cir. 2018) (citations omitted).  The
first type of prior restraint is content-based; the second is
content-neutral.  *Id.* at 387.  "[T]he presumption against [the
constitutional validity of a] prior restraint is best reserved
for situations that closely resemble these two clear cases."
*Id*.

This case arguably resembles the second prior restraint
category: a facially-neutral rule or policy that could be used
to bar certain speech or expression.  In addressing the law of
prior restraint, both parties claim support from two seminal
cases: *Healy v. James*, 408 U.S. 169 (1972) and *Christian Legal
Society Chapter of the University of California, Hastings
College of the Law v. Martinez*, 561 U.S. 661 (2010).  In *Healy*,
the Supreme Court considered whether a college violated the
plaintiffs' free association rights when it denied recognition
of their student group.  Ultimately, the Court remanded the case
for reconsideration of the plaintiffs' claims, as it was unable

to "conclude from this record that petitioners were willing to abide by reasonable campus rules and regulations." *Healy*, 408 U.S. at 194; *see also id.* at 189 (noting that "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules"). Unlike this case, the student group in *Healy* had never been recognized by the school. Relevant to this case, *Healy* noted that recognition of a student group, "once accorded, may be withdrawn or suspended if petitioners fail to respect campus law." *Id.* at 194 n.24.

More recently, the Supreme Court considered a case in which Hastings Law School denied Registered Student Organization status to a Christian student group ("CLS") that excluded students based on religion and sexual orientation. *Martinez*, 561 U.S. at 672-73. CLS argued that the school's action impaired its First Amendment rights to free speech, expressive association, and free exercise of religion by requiring it to accept members who did not share the organization's core beliefs. *Id.* at 668. The Supreme Court found no constitutional violation, holding that by requiring CLS to comply with all school policies and regulations, Hastings was merely imposing a "reasonable, viewpoint-neutral condition on access to the student-organization forum," while CLS was seeking "not parity with other organizations, but a preferential exemption from Hastings' [nondiscrimination] policy." *Id.* at 669.

13

The Court finds that both *Healy* and *Martinez* support Defendants' contention that a university may take action against a student organization when the university's rules have been violated.  Whether those actions are constitutional, however, will largely depend on both the lawfulness of the underlying rules and the extent to which the university's actions were in concert with those rules.  The Court must therefore proceed to UVMSJP's additional constitutional challenges.

## IV.  Constitutionality of UVM's Policies and Actions

### A.  Limited Public Forum

The Verified Complaint challenges the constitutionality both of Defendants' actions and of the policies and procedures being applied.  Defendants submit that those policies and procedures must be viewed, as in *Martinez*, under a "reasonable, viewpoint-neutral" standard.  *Id.*  The "reasonable, viewpoint-neutral" standard applies to First Amendment questions arising in a limited public forum.  *See Tyler v. City of Kingston*, 74 F.4th 57, 63 (2d Cir. 2023).

"[A] limited public forum is created when the government opens a non-public forum for public expression, but limits expressive activity to certain kinds of speakers or the discussion of particular subjects." *Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 552 (2d Cir.

14

2002). Here, there are two possible forums. The first is the forum comprised of student groups. Granting Registered Student Organization status is naturally limited to students registered at the University. Such status allows groups to access non-public resources, including free use of the University's buildings and grounds. The second is the Andrew Harris Commons itself.

*Martinez* determined that a public educational institution considering a group's Registered Student Organization status fit "comfortably within the limited-public-forum category." 561 U.S. at 682. Indeed, courts generally consider a university facility or resource to be a limited public forum. *See, e.g., Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO*, 311 F.3d at 545 ("Examples of limited public fora include state university meeting facilities opened for student groups ...."); *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (concluding that university "created a limited public forum when it made its trademarks available for student organizations to use if they abided by certain conditions"). Correspondingly, "First Amendment free-speech and freedom-of-expressive-association challenges related to regulation of student-run clubs . . . [are reviewed] under the Supreme Court's limited-public-forum doctrine." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th

15

664, 711 (9th Cir. 2023) (Forrest, J., concurring) (citing
*Martinez*, 561 U.S. at 679-80); *see also Rosenberger v. Rector &
Visitors of the Univ. of Virginia*, 515 U.S. 819, 829-31 (1995)
(applying limited public forum standard to restrictions on
student activity fund available to student groups that complied
with certain procedural requirements).  The Court therefore
applies the reasonable, viewpoint-neutral standard to the
University's actions with respect to UVMSJP.  *See Martinez*, 561
U.S. at 682.

The site of the demonstration, the Andrew Harris Commons,
also constitutes a limited public forum.  It is owned by the
University and, like all parts of campus, is "principally
intended for use by University programs, activities, and
operations."  ECF No. 1-4 at 2; *see Am. C.L. Union v. Mote*, 423
F.3d 438, 444 (4th Cir. 2005) ("Contrary to plaintiff's
arguments, the campus is not akin to a public street, park, or
theater, but instead is an institute of higher learning that is
devoted to its mission of public education.").  While both
students and the general public may apply to use the Commons,
both are limited by the University's rules with respect to such
use, with additional rules applying to the public.  ECF No. 1-4
at 3-4 (requiring non-University users to sign a contract, show
proof of liability insurance, and provide a security deposit).
Conditional access by the general public does not impact the

Andrew Harris Commons' status as a limited public forum. *See R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 540 (2d Cir. 2011) (holding that a student newspaper was a limited public forum where there was "no evidence that the school permitted indiscriminate use by the general public") (internal quotation marks and citation omitted); *Mote*, 423 F.3d at 444 ("By implementing its policy the University made the campus a limited public forum.").

**B.    Reasonable and Viewpoint-Neutral**

Having established that the forum in question was, as a matter of law, a limited public forum, the Court must next consider whether Defendants' policies and actions were reasonable.  The Court's "inquiry is shaped by the educational context in which it arises." *Martinez*, 561 U.S. at 685. *Martinez* noted that although courts "owe no deference to universities" when considering whether they have "exceeded constitutional constraints," the Supreme Court has also "cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 686 (quotation marks and citation omitted).  Thus, "[w]ith appropriate regard for school administrators' judgment," the Court undertakes the necessary review. *Id.* at 687.

The alleged infractions listed in the Notice to UVMSJP
begin with the use of the Andrew Harris Commons ("Davis Center
Green") without a reservation.  The University's Posting and
Solicitation Policy requires student organizations to register
with University Events Services for exclusive use of campus
facilities.  Both exclusive and casual (non-exclusive) uses are
"subject to restrictions designed to protect safety, or to avoid
disruption of customary campus activities."  ECF No. 1-5 at 3.
Registration decisions are required to be "granted on a
viewpoint-neutral basis" and "are subject to applicable time,
place, and manner restrictions."  *Id.*

"[U]nder appropriate circumstances, a permitting
requirement governing the use of a public open space can further
a legitimate interest in the regulation of competing uses of
that space."  *Berger v. City of Seattle*, 569 F.3d 1029, 1041
(9th Cir. 2009); *see Bowman v. White*, 444 F.3d 967, 981 (8th
Cir. 2006) (recognizing that university had a legitimate
interest in "ensuring public safety, minimizing the disruption
of the educational setting, and coordinating the use of limited
space by multiple enities").  Moreover, the University "has a
significant interest in ensuring safety and order on campus,
especially where the [property in question] is sited at a highly
trafficked area of the campus."  *Bloedorn v. Grube*, 631 F.3d
1218, 1238 (11th Cir. 2011); *see also Healy*, 408 U.S. at 184

("[A] college has a legitimate interest in preventing disruption
on the campus."). In keeping with these principles, the Court
finds that UVM's registration process, as well as its rules for
casual users, serve reasonable University goals of ensuring
public safety, minimizing disruption, and coordinating the use
of limited space.

Other alleged violations cited in the Notice, including
disruption of normal student engagement or work patterns, also
fit within those same legitimate and reasonable University
goals. The use of tents, and in particular sleeping in the
tents overnight, allegedly violated the University's Temporary
Structures policy. The policy itself states that "[w]hile
temporary structures do not necessarily express thoughts or
opinions, in many cases their purpose is to represent particular
viewpoints symbolically." ECF No. 1-9 at 2. The policy
expresses the University's commitment to "an atmosphere of free
expression and open dialogue," and recognizes that this
commitment "must be balanced with other concerns as well, such
as the safety of our students and employees; the condition and
appearance of our campus; and the prudent use of our financial
and human resources." *Id.* "[O]vernight occupancy of a
temporary structure" such as a tent is expressly prohibited
"[d]ue to safety and security concerns." *Id.* at 3.

Again, the Court finds the University's concerns
reasonable.  The policy in question addressed two well-
established institutional interests: safety and security.  *See,
e.g., Bloedorn*, 631 F.3d at 1238; *Bowman*, 444 F.3d at 981.
Allowing students to sleep outside on University property gives
rise to vulnerabilities that are not present when students are
housed in secure dormitories.  The Temporary Structures policy
addresses those vulnerabilities and furthers the community's
strong interest in maintaining student safety.

In *Martinez*, the Supreme Court also considered the
"substantial alternative channels that remain open for
[UVMSJP's] communication to take place."  561 U.S. at 690.  The
Court explained that "[i]f restrictions on access to a limited
public forum are viewpoint discriminatory, the ability of a
group to exist outside the forum would not cure the
constitutional shortcoming."  *Id.*  When the restrictions "are
viewpoint neutral, [the Supreme Court's] decisions have counted
it significant that other available avenues for the group to
exercise its First Amendment rights lessen the burden created by
those barriers."  *Id.*

*Martinez* recognized that although "CLS could not take
advantage of [Recognized Student Organization]-specific methods
of communication, . . . the advent of electronic media and
social-networking sites reduces the importance of those

20

channels." *Id.* at 690-91.  The same is true here, as UVMSJP is
not barred from using the myriad forms of social and other media
available to express its message.  In short, given the many
alternative forms of accessible communication, UVMSJP cannot
"maintain that nonrecognition of a student organization is
equivalent to prohibiting its members from speaking." *Id.* at
691.

The Court turns next to the question of viewpoint
neutrality.  Unlike *Martinez*, where the law school's decision
touched upon CLS's core principles with respect to membership,
the decision in this case was based on conduct that bore no
direct relationship to UVMSJP's message regarding the war in
Gaza.  The group's actions triggered policies, such as the
Posting and Solicitation policy, based upon conduct.  In turn,
the University responded to alleged violations of those policies
and, despite unsupported allegations of pretext (discussed
below), not to the messages or motivations underlying the
group's speech.  *See, e.g., Martinez*, 561 U.S. at 696 ("The Law
School's policy aims at the act of rejecting would-be group
members without reference to the reasons motivating that
behavior.").

Moreover, the UVM policies do not, as UVMSJP contends,
allow unfettered discretion.  *See Southworth v. Bd. of Regents
of the Univ. of Wis.*, 307 F.3d 566, 570 (7th Cir. 2002) (holding

21

that "the prohibition against unbridled discretion is a
component of the viewpoint-neutrality requirement") (cited in
*Amidon v. Student Ass'n of State Univ. of New York at Albany*,
508 F.3d 94, 103 (2d Cir. 2007)).  Count III of the Verified
Complaint alleges that a request to use campus grounds for a
demonstration must be submitted to the Dean of Students, and
that the University policy provides "no standards" for granting
or withholding permission.  ECF No. 1 at 11, ¶ 59.  Those
requests, however, are handled pursuant to the Facilities and
Grounds Use for Events and Activities policy which, as noted
above, requires consideration of several factors including "the
safety of persons and security of property."  ECF No. 1-4 at 2.
Count IV similarly alleges that the Temporary Structures policy
lacks applicable standards for awarding permits.  That policy,
too, requires consideration of "the safety of our students and
employees."  ECF No. 1-9 at 2.

Safety and security determinations necessarily invite the
use of discretion, yet that discretion must be exercised in the
strict context of those criteria.  *See, e.g., Ramsey v. Squires*,
879 F. Supp. 270, 282 (W.D.N.Y. 1995) (holding that prison
officials did not have unfettered discretion to impose
administrative confinement based upon "safety, security, or
order of the facility"), *aff'd*, 71 F.3d 405 (2d Cir. 1995).
UVMSJP relies heavily on *Shuttlesworth v. City of Birmingham*,

22

wherein a parade permit could be denied based upon the City Commissioners' "own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" 394 U.S. 147, 151 (1969). Such broad criteria are easily distinguished from the narrow safety and security determinations at issue here. *See id.*; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769-70 (1988) (finding discretion to be impermissibly unfettered where ordinance allowed Mayor to deny a license for "such other terms and conditions deemed necessary"); *MacDonald v. Safir*, 206 F.3d 183, 192-93 (2d Cir. 2000) (remanding facial challenge to ordinance allowing Commissioner to deny a permit if he believed the parade "will be disorderly in character or tend to disturb the public peace," and to grant a permit for any "occasion[] of extraordinary public interest, not annual or customary").

The Supreme Court held in *Healy* that "while a college has a legitimate interest in preventing disruption on the campus, which under circumstances requiring the safeguarding of that interest may justify such restraint, a 'heavy burden' rests on the college to demonstrate the appropriateness of that action." 408 U.S. at 184. Here, the interim suspension of UVMSJP meets the University's burden given the multiple alleged violations of rules and policies, and the reasonable and viewpoint-neutral responses to those allegations. *See id.* at 194 n.24 (a

University may suspend an organization that "fail[s] to respect campus law" without violating the First Amendment).  Defendants' actions, and the underlying policies giving rise to those actions, did not violate UVMSJP's constitutional rights.

### C.  Pretext Claim

The Verified Complaint claims Defendants' actions "have been part of [their] hostile, chilling, content-based animus and bias against pro-Palestinian speakers."  ECF No. 1 at 6, ¶ 28. For support, UVMSJP cites the cancellation of a scheduled appearance by a Palestinian poet several months before the demonstration at issue here.  The appearance was allegedly cancelled after pro-Israel groups claimed the poet's works are anti-Semitic.  *Id.*, ¶¶ 29-32.  The Verified Complaint also references other protests and demonstrations, *id.* at 5-6, ¶ 25, and claims the University failed to take action against demonstrators who supported Israeli policies, *id.* at 7, ¶ 33.

While the Court accepts the factual allegations in a complaint as true, the law does not require it to also accept a plaintiff's legal conclusions.  *See Iqbal*, 556 U.S. at 678. Here, the allegations in the Verified Complaint do not support a plausible pretext claim.  Briefly stated, the incidents cited by UVMSJP are readily distinguished from the events in this case. And, as discussed above, the University's actions were taken pursuant to rules and policies that focus on conduct.

The Verified Complaint references a series of previous protests: a 2017 student march into the UVM President's office; a 2018 protest that overtook classrooms and blocked a public street at rush hour; a 2019 student walkout and subsequent demonstration on the Andrew Harris Commons; a blockage of a public street in 2019; a 2021 student protest of the University's response to allegations of sexual assault on campus; a 2021 protest and march that involved University spaces, including open greens and a campus building, while at times blocking traffic; and the annual 4/20 protests that occurred prior to the legalization of marijuana in Vermont. ECF No. 1 at 5-6, ¶ 25. The Verified Complaint does not allege that any of these events involved a Recognized Student Organization violating a University rule or policy. The Verified Complaint also does not claim that any of the cited events involved a multi-day demonstration, a lack of proper registration, or the overnight use of tents.

UVM cannot regulate public streets, and cannot discipline persons or groups not affiliated with the University. With respect to an alleged preference for pro-Israel protesters, there is no claim that such protesters engaged any of the conduct, or even similar conduct, addressed in the University's Notice to UVMSJP. Accordingly, the allegations in the Verified

25

Complaint do not plausibly support the assertion that these other events offer evidence of pretext.

As discussed above, the Verified Complaint also contends that UVM's policies grant University officials "unbridled discretion," thus presumably allowing for pretextual decision-making. The Court addressed the safety and security questions previously. The Facilities and Grounds Use for Events and Activities policy also includes a non-discrimination provision, requiring compliance with all University policies related to affirmative action and equal opportunity. ECF No. 1-4 at 4. This latter provision, rather than allowing unfettered discretion, requires administrators to adhere to the University's rules and values with respect to discrimination. If dissatisfied, an applicant may file an appeal. *Id.* at 5. Such guardrails on official conduct are sufficient to satisfy constitutional concerns. *See Perry v. McDonald*, 280 F.3d 159, 171 (2d Cir. 2001).

### D. Due Process Claims

Count V of the Verified Complaint alleges that the University failed to provide fair notice of the conduct that was forbidden, adequate alternatives for expression, or an opportunity "to cure any such constitutionally unprotected activities." ECF No. 1 at 15, ¶ 80. UVMSJP also contends that the students had "an objective good faith basis to believe that

26

their activities were lawful and/or that permit requirements had
been waived." *Id.* at 16, ¶ 81.  Count VI alleges that denying
assistance of counsel in the investigation process further
violates the group's due process rights.

A procedural due process claim requires two elements: "(1)
the existence of a property or liberty interest that was
deprived and (2) deprivation of that interest without due
process." *Bryant v. N.Y. State Educ. Dept.*, 692 F.3d 202, 218
(2d Cir. 2012).  UVMSJP claims that it lacked notice of the
relevant rules and policies, as well as the factual bases for
the charges being brought.  There is no dispute that the
University's rules and restrictions were available to the
student body.  Whether students knew the rules, despite their
ready availability, does not factor into the due process
analysis.  *See Wilson v. Johnson*, 247 F. App'x 620, 626-27 (6th
Cir. 2007) ("the University is under no obligation to ensure
every person has 'specific' notice of its policies ....  Its
policies were published and generally available to anyone
interested in learning of them."); *cf. Lambert v. California*,
355 U.S. 225, 228 (1957) (noting that the "[t]he rule that
'ignorance of the law will not excuse' is deep in our law ....")
(quoting *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68
(1910)).

As to notice generally, the Student Organization Misconduct and Resolution policy fully describes the suspension procedure implemented in this case. The policy specifically allows for an interim suspension of a student organization if the action in question constitutes "a threat to the safety, security, or welfare of the University community and/or an obstruction to accomplishing the University's lawful mission." ECF No. 1-3 at 4. While UVMSJP argues that UVM failed to allow an immediate challenge to the suspension, the policy provides that any interim action can be re-evaluated throughout the investigative process "as additional information is learned." *Id.* UVMSJP also objects to the lack of a pre-deprivation hearing, though none is required when the safety and welfare of the community is in question. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.").

The Verified Complaint further claims that UVM waived its right to enforce its policies by, in part, failing to remove the tents or provide a notice of trespass. UVM issued the Notice to UVMSJP midway through the multi-day demonstration. UVMSJP was notified of the alleged violations, including the facts underlying those violations (*e.g.* overnight occupancy of a

28

temporary structure), and had the opportunity to address its
conduct as it deemed appropriate.  UVMSJP offers no authority
for the proposition that the University's failure to take
further steps, including removing the tents by force, waived its
right to pursue the remedies available in the Student
Organization Misconduct and Resolution policy.

Count V also alleges that UVMSJP was allowed to disregard
University policies because its members believed in good faith
that their actions were lawful.  For support, UVMSJP cites
*Wagner Seed Company v. Daggett*, 800 F.2d 310, 315-16 (2d Cir.
1986), in which the Second Circuit addressed the question of
monetary penalties assessed by the opposing party while
litigation is pending.  The court determined that "[o]ne way of
ensuring that a plaintiff is not faced with such
unconstitutional penalties is to require that no penalty be
imposed where a challenge was brought in good faith."  *Id.* at
315.  Monetary penalties are not at issue here.

UVMSJP further cites *Shuttlesworth*, which held that when
faced with an unconstitutional law requiring a permit or license
prior to engaging in expressive activity, a party "may ignore
[the law] and engage with impunity in the exercise of the right
of free expression for which the law purports to require a
license."  394 U.S. at 151.  That holding does not apply here,
in part because UVMSJP claims it did not have notice of, and

29

thus could not have ignored, the University's demonstration
policies.  Furthermore, the Verified Complaint makes clear that
the demonstration continued beyond the May 1, 2024 Notice, and
in particular that the tents in question were taken down at the
demonstration's natural end point.

Count VI claims that Defendants are violating UVMSJP's due
process rights by barring its attorney from appearing in the
investigation process.  "[T]he weight of authority is against
representation by counsel at disciplinary hearings, unless the
student is also facing criminal charges stemming from the
incident in question."  *Gorman v. Univ. of Rhode Island*, 837
F.2d 7, 16 (1st Cir. 1988); *see Wasson v. Trowbridge*, 382 F.2d
807, 812 (2d Cir. 1967).  The University's practice is in
keeping with that "weight of authority," *Gorman*, 837 F.2d at 16,
and nothing in the University's rules prevents UVMSJP from
consulting with counsel generally.

Finally, in August 2024 UVMSJP reportedly informed the
University that it would no longer participate in the
investigation process, thus voluntarily removing itself from the
process being afforded.  For each of these reasons, the Court
finds no plausible due process claim.

## V.   Leave to Amend

In its opposition to the motion to dismiss, Plaintiff
proffers new facts that are not in the Verified Complaint.  The

Court does not consider such facts when presented with a motion under Rule 12. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court also expresses no opinion as to whether the proffered facts would have changed its conclusion on the matters discussed above. Nonetheless, Plaintiff may wish to present additional facts and argue that such facts render its claims plausible. The Court therefore grants Plaintiff 30 days in which to file a motion to amend the Verified Complaint.

## **Conclusion**

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 9) is granted, and UVMSJP's motion for a preliminary injunction (ECF No. 2) is denied as moot.[3] Plaintiff may file a motion to amend its Verified Complaint within 30 days of this Opinion and Order. Failure to file such a motion will result in dismissal of the case and entry of final judgment.

DATED at Burlington, this 20th day of December 2024.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

---

[3] If the Court grants the motion to amend the Verified Complaint, UVMSJP may again move for preliminary injunctive relief.